UNITED STATES of America, Plaintiff–Appellee,

v.

Paul R. STAFFORD, Sr., and Robert L. Allison, Defendants–Appellants.

Nos. 97–1542, 97–1543.

United States Court of Appeals, Seventh Circuit

Argued Nov. 4, 1997.

Decided Feb. 3, 1998.

As Amended Feb. 18, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 97–1543 March 9, 1998.

John W. Vaudreuil (argued), Timothy M. O'Shea (argued), Peggy A. Lautenschlager, Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Paul R. Stafford, Sr., Milan, MI, pro se, John K. Smerlinski (argued), Madison, WI, for Defendant–Appellant Stafford.

Patrick J. Stangl (argued), Stangl Law Office, Madison, WI, for Defendant–Appellant Allison.

Before POSNER, Chief Judge, and COFFEY and ROVNER, Circuit Judges.

POSNER, Chief Judge.

The defendants, Stafford and Allison, were tried together before a jury on a variety of charges relating to an advance-fee loan scam, were convicted, and were sentenced to 188 and 160 months of prison, respectively.

In this type of scam, the con men make a phony offer of a large loan on highly advantageous terms upon condition that the borrower pay a sizable fee in advance. The con men pocket the fee and abscond. The defendants have a long history of such scams. The one for which they were convicted in this case unfolded in a town in Wisconsin in which Greg Berna was the comptroller of a trucking company. Berna wanted money to go into business for himself. The defendants represented themselves to Berna—falsely, indeed preposterously—as being international financiers to dwarf George Soros, as they were, among their other deals, closing "$6 trillion in Yen contracts." They had also financed, they said, General Motors, a stadium for the Milwaukee Brewers, and the 1994 Winter Olympics, as well as assisting the federal government to thwart the financial skullduggery of Saddam Hussein. They claimed to be a conduit for wealthy Saudi investors; and one of them claimed to be a former CIA agent. All their claims were false. Mary McCarthy's famous libel of Lillian Hellman—"Every word she writes is a lie, including 'and' and 'the'"—would come close to fitting our two con men.

They offered Berna a multi-million dollar loan at a favorable interest rate. They milked him for advance fees until he had exhausted his personal savings, whereupon he began embezzling from his employer. (We affirmed his sentence for embezzlement, under the wire fraud statute, in *United States v. Berna*, 995 F.2d 711 (7th Cir.1993).) He did this through the "Comdata System," a money-transfer system used in the trucking industry. When one of the drivers for a trucking company needs cash, he calls up the company and the company dictates to him a series of numbers, constituting a code, several numbers of which identify the company and the amount of cash authorized to be transferred to the driver. Truck stops have blank "comchecks" which the driver can fill out, entering the code. The cashier calls Comdata at its office in Tennessee, and if Comdata verifies the code number and amount written on the check, the cashier pays that amount to the truck driver and is reimbursed by Comdata, which in turn is reimbursed by the driver's employer. Berna had access to his employer's set of Comdata codes, and he stole them and gave them to the defendants. The defendants used the codes to cash comchecks with the help of a team of associates in crime whom they also used to send faxes and letters designed to bolster the defendants' appearance of legitimacy. Berna must have been extremely gullible, for, apart from the implausibility of a $6 trillion loan (and, later, a separate $3 trillion deal that the defendants said they were about to close), the defendants and their minions were barely literate—writing, for example, "breakdown" (as in the breakdown of the proceeds of a loan) as "brake down" and "Lichtenstein" as "Liech-tenstein."

Eventually Berna's employer, Roehl, discovered his embezzlement, but the defendants stepped in and offered Roehl a $20

million loan out of the proceeds of that $3 trillion deal that they were about to close. We do not know whether Roehl believed them. But he did not report Berna to the police or even fire him. He thought that if he kept him on, there was a better chance of recovering the $250,000 that Berna had embezzled. But, astonishingly careless, Roehl failed to restrict Berna's access to the Comdata codes, so the defendants kept fleecing Roehl's company. Before they were through, they had defrauded it of more than $1 million.

They had told Berna that the advance fees were for legal and other expenses related to making him the multi-million dollar loan. In fact the money they obtained from him and later from Roehl was used for personal expenses, including the upkeep of 30 cats and the purchase of seven automobiles for seven exotic dancers. (Allison was the feline benefactor; Stafford supported the exotic dancers.)

■ The defendants appeal on a number of grounds, of which the first is that the prosecutor in closing argument referred to documents that had not actually been admitted into evidence. This is incorrect and in any event immaterial; the evidence of the defendants' guilt was not only overwhelming but virtually uncontested.

■ The district judge excluded evidence relating to the defendants' defense that they were acting in good faith—that they really did intend to obtain the multi-million dollar loans for Berna and later for his employer. The excluded evidence did not tend to show that, but even if it had, it would have been properly excluded. The fraud was making false representations intended to separate Berna from his and later his employer's money. The falsity of the misrepresentations is conceded. Had the defendants told the truth about themselves—that they were con men, with no experience in finance—then even if they had sincerely intended to obtain loans for Berna and his employer, Berna, gullible though he was, would not have paid them a dime in advance fees. The fraud was the extraction of those fees by means of lies. *United States v. Dunn,* 961 F.2d 648, 651 (7th Cir.1992); *United States v. Harvey,* 959

F.2d 1371, 1375 (7th Cir.1992). Nothing in the excluded evidence contradicted the charge.

■ At the close of the evidence, a juror sent a note to the judge asking whether the alternate juror (whom the judge had said she would select after the closing arguments) could "stay in the jury room to hear the sentencing." The judge answered that the alternate could not "remain in the jury room to participate in the deliberations." The defendants argue that the juror's note means that this juror had decided in advance of the closing arguments and the jury instructions to convict and move directly to sentencing. The judge thought the reference to "sentencing" an innocuous terminological error; the juror obviously meant "deliberations." The judge was surely right. The jury does not participate in sentencing. Far from telling the jury that it did, she emphasized that it was not to make up its collective mind about the defendants' guilt until it went into the jury room and began its deliberations.

When the note first surfaced, the defendants asked that the juror be disqualified but did not request an evidentiary hearing. The note in itself could hardly be considered conclusive evidence of prejudice, so the motion to disqualify could be thought implicitly to be requesting a hearing at which the identity of the juror who had sent the note would be established and that juror and perhaps the other jurors could be quizzed by the judge about the meaning of the note. Such a hearing would be routine in a case in which jury misconduct was alleged and the allegation was sufficiently substantiated to warrant a further inquiry. *United States v. Reynolds,* 64 F.3d 292, 295–96 (7th Cir.1995); *United States v. Sanders,* 962 F.2d 660, 670 (7th Cir.1992); *United States v. Armstrong,* 909 F.2d 1238, 1244 (9th Cir.1990).

■ Not every allegation of jury misconduct is sufficiently substantial or sufficiently well substantiated to warrant putting the jurors on the spot in this fashion. The probability that the juror who wrote the note (or other jurors, or the jury as a whole) thought that conviction precedes trial and that the jury's only function is to sentence the defen-

dant is too slight to have required a further inquiry. Quizzing a juror, or perhaps all the jurors, in the middle of a trial is likely to unsettle the jury, and the judge is not required to do so unless there is a much stronger indication of bias or irregularity than there was here. *United States v. Davis*, 15 F.3d 1393, 1412–13 (7th Cir.1994); *White v. Smith*, 984 F.2d 163, 166–67 (6th Cir.1993). After the jury returned its verdict, the defendants did request a hearing. But that was too late, as the defendants would have been seeking testimony from a juror designed to impeach the jury's verdict without any basis for supposing that the jury had been subjected to outside influences. Fed.R.Evid. 606(b); *Tanner v. United States*, 483 U.S. 107, 125, 107 S.Ct. 2739, 2750, 97 L.Ed.2d 90 (1987).

■ The judge gave Allison a three-point sentencing enhancement on the ground that he played a managerial role in the scam. U.S.S.G. § 3B1.1(b). As he did, not only by joining with Stafford in supervising the faxers, mailers, and comcheck cashers who were the supporting cast in the scam, but also by being the defendant who made Berna not merely a victim but also a tool of the fraud by obtaining the Comdata codes from him.

■ The next ground of appeal is the most frivolous of all, but warrants discussion because it reveals the possibility of unethical conduct on the part of Stafford's lawyer, John Smerlinski. Smerlinski states in his brief that the prosecutor, while questioning one of the government's witnesses, turned to Stafford and said, "Then why don't you take the stand?" Such a statement by a prosecutor, made in the hearing of the jury (as Smerlinski claims it was), would be so clear a violation of the rule of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which forbids prosecutors to comment to the jury on the defendant's exercise of his Fifth Amendment right not to be compelled to testify against himself, as to expose the prosecutor to punishment for unethical behavior. *United States v. Hasting*, 461 U.S. 499, 506 n. 5, 103 S.Ct. 1974, 1979 n. 5, 76 L.Ed.2d 96 (1983); *United States v. Morgan*, 113 F.3d 85, 89–90 (7th Cir.1997). Smerlinski had made this charge during the trial.

The prosecutor had denied it. The judge had not heard any such statement. The transcript contains no hint of it. Smerlinski has made no effort to substantiate his serious charge even to the extent of submitting an affidavit that he really heard such a statement. At argument he told us that he had asked the district court to allow him to call a witness who would testify to having heard the prosecutor's statement. He said that he would file with us the citation to the transcript where this request appears. He has done so, but the transcript shows that he withdrew his request to be allowed to call a witness upon the judge's suggesting that they wait and see what the transcript of the day on which the prosecutor made the alleged statement showed. That transcript, as we have said, showed nothing.

■ For one lawyer to accuse another of unethical behavior without any evidence to back up the accusation is unethical. *Galle v. Orleans Parish School Board*, 623 So.2d 692 (La.App.1993). We are therefore issuing to Mr. Smerlinski a rule to show cause why he should not be sanctioned.

■ The last two grounds of appeal (apart from some utterly frivolous grounds, unnecessary to discuss, raised in Stafford's supplemental pro se brief), and the most substantial, have to do with jury selection and statutory interpretation, respectively. During jury voir dire the only black prospective juror, Christine Thomas, said she was "very deeply involved with my church. I coordinate our homeless ministry program and have done so for the past seven years through our church." She also said that her "favorite television shows are usually the gospel programs that are only on Sunday mornings." The government used one of its peremptory challenges to strike Thomas. Allison's lawyer challenged the strike under the *Batson* principle, which forbids the use of race as the basis for a peremptory challenge. The junior of the two prosecutors replied, "Ms. Thomas sounds like she watches gospel programs as well. Our concern was a person who we believe to have strong religious convictions would tend to be sympathetic to any defendant." The senior

prosecutor interjected that the idea to strike Thomas was his, not his junior colleague's, and that he hadn't discussed it with him. (No doubt the senior prosecutor was embarrassed that his colleague should have given "strong religious convictions" as a ground for excluding a juror—it would exclude a substantial fraction of the American population.) He said that he'd had the experience during his sixteen years as a prosecutor with "somebody who is so deeply ... involved in church and watches gospel programs and involved in that sort of life that they would find it difficult, if not impossible, to sit in judgment on a fellow human being." The judge said, "Right. That's a reason, okay." Allison's lawyer said, "Thanks, Your Honor," and the matter was dropped.

On appeal Allison argues that when the junior prosecutor said "as well" the unfinished thought was "as being black." This is conjecture and was not pressed on the district judge. Allison's main argument is that the senior prosecutor's race-neutral explanation was pretextual, that is, a lie, and that the real motive was race. The judge obviously thought not, and we do not see on what basis we can overturn her judgment of credibility. *Hernandez v. New York,* 500 U.S. 352, 364–65, 111 S.Ct. 1859, 1868–69, 114 L.Ed.2d 395 (1991) (plurality opinion); *United States v. Carter,* 111 F.3d 509, 512 (7th Cir.1997); *United States v. Cooper,* 19 F.3d 1154, 1160 (7th Cir.1994). When in response to a *Batson* challenge the prosecutor gives a race-neutral reason that persuades the judge, there is no basis for reversal on appeal unless the reason given is completely outlandish or there is other evidence which demonstrates its falsity. Neither condition is satisfied.

Allison also argues that *Batson* should be extended to religion. This is a matter on which there is a division of judicial opinion. Compare *State v. Davis,* 504 N.W.2d 767 (Minn.1993), with *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and *Davis v. Minnesota,* 511 U.S. 1115, 1116, 114 S.Ct. 2120, 2121, 128 L.Ed.2d 679 (1994) (dissent from denial of cert.). It is necessary to distinguish among religious affiliation, a religion's general ten-

ets, and a specific religious belief. It would be improper and perhaps unconstitutional to strike a juror on the basis of his being a Catholic, a Jew, a Muslim, etc. It would be proper to strike him on the basis of a belief that would prevent him from basing his decision on the evidence and instructions, even if the belief had a religious backing; suppose for example that his religion taught that crimes should be left entirely to the justice of God. In between and most difficult to evaluate from the standpoint of *Batson* is a religious outlook that might make the prospective juror unusually reluctant, or unusually eager, to convict a criminal defendant. That appears to be this case.

We need not pursue this interesting byway; for it *is* a byway in this case. Allison's lawyer didn't cite religion as a basis for his *Batson* challenge. We can reverse therefore only if the use of religion as the basis for a peremptory challenge (as this case might be thought to involve) is a plain error. Fed. R.Crim.P. 52(b). It is not. The constitutional status of peremptory challenges based on religion is unsettled, and this is enough to show that the judge's error in allowing Christine Thomas to be struck, if it was an error, was not a plain error. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); *United States v. Davis, supra,* 15 F.3d at 1407–08.

The last ground of appeal, which is advanced only by Allison, involves the charge in the indictment that in transmitting the Comdata codes that Berna had given him across state lines to comcheck cashers working for the defendants, Allison violated the first paragraph of 18 U.S.C. § 2314. This provision makes it a crime to transport, transmit, or transfer in interstate or foreign commerce "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." The government concedes that the codes are not securities or money, but it says that they are goods, wares, or merchandise.

They're not; they're information. No doubt Allison wrote them down rather than committing them to memory, but he was not

charged with having transported pieces of paper containing codes across state lines and we need not decide whether such transportation would violate the statute. He was charged with transferring the codes themselves, which are simply sequences of digits. The sequences have no value in themselves; they are information the possession of which enables a person to cash a check. If this information comes within the statutory terminology of goods, wares, or merchandise, then so does a tip phoned by a crook in Chicago to one in San Francisco that by posing as a police officer he has learned that Wells Fargo bank in San Francisco is poorly protected and so can be knocked off easily. Given the statute's age (it was enacted in 1934 as the National Stolen Property Act, 48 Stat. 794) and wording, and the principle that the definition of federal crimes is a legislative rather than a judicial function—a principle that places some limits on creative judicial interpretations of federal criminal statutes, *United States v. Lanier*, 520 U.S. 259, —— ——, 117 S.Ct. 1219, 1224–25, 137 L.Ed.2d 432 (1997); *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971)—we don't think the first paragraph of section 2314 will stretch this far. The government presses on us cases that hold, very sensibly as it seems to us, that wire transfers of money can violate the statute. E.g., *United States v. LaSpesa*, 956 F.2d 1027, 1035 (11th Cir.1992); *United States v. Goldberg*, 830 F.2d 459, 466–67 (3d Cir.1987). What is transferred is intangible, the claim represented by money rather than the rice paper itself, but it is money, and the statute expressly includes transfers of "money." The Comdata code has to be "goods, wares, [or] merchandise" to come within the statute. It is none of those things. Allison is therefore entitled to be resentenced, while the judgment in Stafford's case is affirmed in its entirety.

So Ordered.