**UNITED STATES, Appellee,**

v.

**Deborah A. BROWN, Defendant–Appellant.**

**Docket No. 02–1135.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 3, 2003.

Decided: Dec. 16, 2003.

disposed of by the remaining members of the panel, who are in agreement.

Frank Policelli, Utica, N.Y., for Defendant–Appellant.

Andrew T. Baxter, Assistant United States Attorney, for Glenn T. Suddaby, United States Attorney for the Northern District of New York, for Appellee.

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge.

Defendant Deborah Brown appeals from a conviction, entered in district court for the Northern District of New York (Mordue, *J.*), for mail fraud and conspiracy to defraud the United States Department of Health and Human Services (HHS). She argues that the prosecutor exercised a peremptory challenge against a black venire member on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In the alternative, she contends that the prosecutor contravened *Batson*'s principles, and those of subsequent cases, by basing that same challenge on the prospective juror's religion. She did not raise this latter claim during jury selection, as she was required to do, and it is therefore subject to plain error review. With respect to defendant's race-based *Batson* claim, we affirm, since she has not shown that the prosecutor's race-neutral explanation was pretextual. With respect to the defendant's religion-based *Batson* claim, we affirm, because she has not demonstrated plain error.

*BACKGROUND*

Defendant–Appellant Deborah Brown and her mother, Mattie L. Brown, were convicted in 2002 for misdeeds connected to their positions as directors of Utica Head Start, a federal childcare program.[1] Specifically, Deborah Brown was found guilty, following a jury trial in district

---

1. Mattie Brown is not a party to the instant appeal.

court in the Northern District of New York (Mordue, *J.*), (1) of conspiracy to defraud HHS, and to convert federal funds, by engaging in nepotism and conflicts of interest, in violation of 18 U.S.C. § 371; and (2) of mail fraud, by lying to a mortgage company about her employment status at Utica Head Start, in violation of 18 U.S.C. § 1341. She was sentenced to a 24-month prison term and is currently serving her sentence.

*The* Batson *Objection and Response*

During jury selection prior to trial, the prosecutor exercised a peremptory challenge against one of three African-Americans in the venire. Brown's trial counsel made a timely *Batson* challenge, asserting that the prosecutor had impermissibly struck the potential juror on the basis of her race. The prosecutor did not explicitly concede that the defense had made a prima facie showing of discrimination, but he did offer a race neutral explanation. He stated that the potential juror in question, a Ms. Diane Underwood, "explained to the jury that she's very active in local and I guess regional church." He went on to note that "[o]ne of Mattie Brown's supporters who is going to be here through the trial I guess was identified by her as someone that she knows from meetings, and I just feel that that would—that connection would subtlely or unsubtlely bias her in favor of the defendants and so that's my basis for my objection to her."

The prosecutor's proffered reason related in part to an exchange between the court and Ms. Underwood, which occurred earlier during voir dire. The relevant portion follows:

COURT: Okay. All right. Can you think of anything I should ask you that has not been asked?

UNDERWOOD: I wanted to—the people that are in here today, in the back, are they a part of this?

COURT: Yes.

UNDERWOOD: I go—I'm [a] member of the Churches of God In Christ Jurisdiction Number 1 . . . [A]nd the elder back there, I don't know him personally, but I know he's an elder in that jurisdiction.

COURT: Okay. Now is that going to affect your ability to serve, be a fair juror?

UNDERWOOD: Oh, no.

COURT: I don't know if he's going to testify or not, but, you know of him.

UNDERWOOD: I know that he attends, he's an elder there, I don't know him personally.

COURT: All right. Thank you.[2]

After the prosecutor gave his initial explanation for striking Ms. Underwood— her familiarity with this church elder— defense counsel responded by observing that "she unequivocally stated it wouldn't have any effect on how she would be as a juror in this case." The prosecutor then offered a second reason for the strike: Ms. Underwood's avid participation in church affairs. Ms. Underwood had told the court that in her "spare time," she liked to "[g]o to church." And during the prosecutor's own questioning of the venire members, Ms. Underwood had explained that she traveled twice a year from Syracuse to Rochester for "state meeting[s]," and had indicated that she also attended national meetings in Memphis. Based on these responses, the prosecutor said:

2. The prosecutor followed up with more questions about her familiarity with the "elder" seated in the audience. She stated that she had seen him "lots of time," [sic] and that he

was a member of "Bishop Kendrick's staff." She also said, "I don't know his name, ... but I know his face."

I also find that, also just for the purposes of making a record, Juror Number 2, Miss Saliba, I'm striking her in part because she's married to a pastor and my general feeling as a prosecutor, that people who are very active in church groups sometimes find it very difficult to judge others and so I think my strike of Miss Underwood is consistent with my other strike.

Upon hearing this second reason, the district court interjected that the Book of John contains the admonition "let not you who sinned cast the first stone, something like that." Neither lawyer responded to the district court's citation of scripture, nor did defense counsel object to this second reason for striking Ms. Underwood. Instead, he continued to focus on the first reason, arguing that she never "indicated that she knew the pastor" and that she "recovered herself very well" by stating she would have no trouble being impartial. The prosecutor responded to these arguments by returning to Ms. Underwood's church activities: "Again, I'm not challenging her for cause. I go to church with a number of ladies like Ms. Underwood and Ms. Saliba and they're wonderful women. If I had an illness in the family, they'd be the first person I'd call on the phone; that doesn't mean I want them to sit on a criminal jury."

At that stage, the district court overruled defense counsel's *Batson* challenge, concluding that the prosecutor had "laid a sufficient basis for why he exercised that peremptory." Neither the court nor defense counsel ever directly addressed the prosecutor's explanation regarding the venire member's participation in church affairs. Thus, while defense counsel had raised a *race*-based *Batson* challenge during jury selection—a challenge which was ultimately denied—he never offered a *religion*-based *Batson* challenge.

*Post-trial motions*

In a post-trial motion for a judgment of acquittal and/or a new trial, defendant Mattie Brown reasserted her race-based *Batson* claim, and, for the first time, offered a religion-based *Batson* objection as well. Deborah Brown also filed post-trial motion papers, but did not raise any *Batson* claim. During oral argument on the motions, however, defense counsel for Deborah Brown made several arguments in connection with the *Batson* challenge. Three are worth some discussion.

First, Deborah Brown asserted that the government had no factual basis for concluding that the man recognized by Ms. Underwood was actually a "supporter" of Mattie or Deborah Brown. Her defense counsel surmised during oral argument that the prosecutor must have assumed a connection between the pastor and the defendants because all three of them were black. The prosecutor responded by observing that "one of the Assistant U.S. Attorneys in our office is a man of color from the Utica area who recognized him as a pastor from that area and I don't think it is unreasonable to assume that a pastor from the Utica area who shows up in the audience … may be a supporter." The judge indicated that he had drawn a similar inference: "I was under the impression that he was also there as a supporter of Mattie Brown."

Second, defense counsel argued that the prosecutor's concerns about Ms. Underwood's involvement in her church were simply an "afterthought," and therefore pretextual. The prosecutor insisted that he had stricken the juror for both reasons, and had offered the additional reason to show that he was not singling out black venire members, but rather treating all potential jurors equally.

Third, Deborah Brown's counsel stated that *Batson* and its progeny do not permit

the use of peremptory challenges to strike venire members because of their religious beliefs, and that Ms. Underwood had been impermissibly struck on the basis of her religion. The government responded by noting that defense counsel had failed to raise a religion-based *Batson* challenge during jury selection, and hence that any inquiry on post-conviction review must apply plain error review. Moreover, according to the government, because the Second Circuit had never conclusively decided the issue, the error in question could not possibly have been plain. Defense counsel, in response, asserted that the trial court had prevented the defendants from fully articulating their *Batson* challenge—thus discharging the Browns from their obligation to object.

## The Decision Below

The district court rejected both the race- and religion-based *Batson* challenges and denied the post-trial motions. First, Judge Mordue concluded that he had correctly followed the prescribed inquiry when the race-based challenge was raised; that is, he had "determined that defendants had not carried their burden of showing intentional racial discrimination and allocated credibility to the prosecutor's explanation finding it to be sufficient." He also found that "the record demonstrate[d] ... that defense counsel had ample opportunity to speak" before the court ruled. Finally, after finding that no relevant objection had been made at trial, the court applied a plain error standard to the religion-based challenge. In a footnote, the court concluded that, "[b]ecause the law is unclear [on whether religion-based peremptory strikes are proper], any failure by the Court to sustain defendant's objection on the basis of religion could not be plain error."

## DISCUSSION

On appeal, we are presented with two questions. First, did the prosecutor exercise a peremptory challenge against a black venire member on account of her race? Second, did the court below commit plain error in upholding the prosecutor's exercise of that same strike, when it was explicitly based, at least in part, on the venire member's participation in religious activities? We consider each of these questions in turn.

### Defendant's Race–Based Objection

■■ In *Batson,* the Supreme Court set forth a three-prong test to determine whether a peremptory challenge has been exercised on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment. First, the defendant must establish a *prima facie* case of discrimination. Second, the prosecutor must offer an explanation for the strike that is, on its face, race-neutral. Third, the trial court must determine whether the defendant has carried her burden of proving that the government's proffered reason was pretextual, and that the strike was indeed motivated by purposeful discrimination. 476 U.S. at 97–98, 106 S.Ct. 1712.

■■ Whether or not the defendant properly established a *prima facie* case is not before us, because "[o]nce a prosecutor has offered a race-neutral explanation ... and the trial court has ruled on the ultimate question of intentional discrimination," both of which occurred in this case, "the preliminary issue ... becomes moot." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Moreover, it is clear that the prosecutor offered reasons for exercising the challenge that were at least facially race-neutral, in satisfaction of the second prong. Thus, the critical question here is whether the reason (or reasons) given by the government were pretextual. And the "ulti-

mate burden of persuasion regarding racial motivation rests with ... the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

█ Although Deborah Brown did not raise the race-based *Batson* challenge in her post-trial motions papers, the government does not argue on appeal that she failed to preserve this particular objection.[3] As a consequence, we review the trial court's disposition of her race-based claim under the standard we normally apply in *Batson* cases. Once a trial judge finds that a prosecutor has exercised his peremptory challenges without discriminatory intent, that finding "may not be disturbed on appeal unless it is clearly erroneous." *United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir.1998). This is so in large part because "a court's determination ... will often turn on the judge's observations of prospective jurors and the attorneys during voir dire and an assessment of their credibility." *McCrory v. Henderson*, 82 F.3d 1243, 1248 (2d Cir. 1996); *see also Barnes v. Anderson*, 202 F.3d 150, 157 (2d Cir.1999) ("The credibility of an attorney offering a race-neutral explanation is at the very heart of that analysis.").

Brown argues that both of the prosecutor's proffered reasons for the strike were pretextual, and that the district court's finding to the contrary was clearly errone-ous. The defendant characterizes the prosecutor's reference to Ms. Underwood's religious activities as an "afterthought." On her view, the prosecutor identified the venire member's familiarity with the pastor seated in the courtroom as "the basis for my objection to her," and only when challenged did he supplement that explanation with a second reason based on her participation in church affairs. This alone, according to Brown, is enough to establish pretext. Moreover, she asserts, the prosecutor did not strike two white venire members with expressed ties to their churches—one who sang in a church choir and one whose wife ran a church daycare center.

We are not convinced. The prosecutor immediately gave his second reason as an elaboration on his original one. Hence, the trial judge could readily have read it as an alternative rationale, rather than as an "afterthought." Moreover, even though the prosecutor did not strike two churchgoers, he did strike a white woman, the wife of a pastor, because her answers reflected avid participation in church activities.. Under a clearly erroneous standard, we cannot conclude that the prosecutor was incapable of distinguishing between people with more, from those with less, of a connection to their churches. And we certainly cannot say that the district court clearly erred in finding that the prosecutor had done just that.[4]

---

3. Judge Mordue stated in a footnote that because Deborah Brown "did not raise the *Batson* issue[s] in her motion papers, the Court is without jurisdiction to address them, as they were first presented to the Court on July 5, 2001, more than a month past the post-trial motion filing deadline." His findings on both the race-based and religion-based challenges thus relate only to *Mattie* Brown's post-trial objections. In the instant appeal, however, we treat those findings and conclusions as relevant to *Deborah* Brown's arguments.

4. Defendant would have us focus on the prosecutor's initial explanation: the juror's familiarity with a supposed supporter of the Browns. She claims that the only basis for asserting that support was racial stereotyping. The prosecutor denies this vehemently. We express no view on whether this was or was not the ground for the assertion, because we do not need to. We note that even if it had been, it would fail to support a *Batson* claim. The exclusion of the juror would not have been because of *her* race, for the same explanation, based on the same alleged ster-

**662**

We therefore affirm its ruling that the striking of Ms. Underwood was race-neutral and non-pretextual.

### Defendant's Religion–Based Objection

#### 1. Standard of Review

The defendant also challenges the prosecutor's peremptory strike on the grounds that it was impermissibly based on the venire member's religion. She argues that the prosecutor intentionally removed Ms. Underwood from the panel because of her affiliation with a Christian church, and that doing so violated *Batson*.[5]

■ In answer, the government first points out that Brown did not make a religion-based *Batson* objection during jury selection. It adds that her failure to do so prior to completion of the *voir dire* constitutes forfeiture of the right, absent extraordinary circumstances. *See Franklyn*, 157 F.3d at 97 ("[A] lawyer must challenge an adversary's use of peremptory challenges *before* the completion of jury selection, in part so that the court can (i) contemporaneously assess the adversary's conduct; and (ii) remedy any improper conduct without having to repeat the jury selection process.") (emphasis added); *see also McCrory*, 82 F.3d at 1249 (holding same).

■ The defendant disputes forfeiture, asserting that her trial counsel raised a general *Batson* objection, that he gave the court an opportunity to "cure the error," and that any further objection would have been fruitless.[6] We disagree. Defendant's attempts to make her race-based challenge encompass her religion based claim do not avail. Her trial counsel was obligated to state distinctly the matter objected to and the grounds of the objection, and to do so at the time. *See Galarza v. Keane*, 252 F.3d 630, 638 (2d Cir.2001) ("[A] party must raise his or her Batson challenges in a manner that would allow a trial court to remedy the problem at trial . . . ."); *see also United States v. Indiviglio*, 352 F.2d 276, 280 (2d Cir.1965) (specific instructions are required to "give the judge an opportunity to correct the error and thus to avoid the necessity of further proceedings"). This he did not do: While Brown's counsel explicitly leveled a charge of racial discrimination during jury selection, he failed to object or even to respond to the prosecutor's explanation based on the venire member's religious affiliation.

■ It follows that Brown cannot show, with respect to the religion issue, that "the trial court had been clearly apprised of the possibility of error and had disagreed, or had been given an opportunity to correct

eotyping, could as easily apply to a white prospective juror who was acquainted with the supposed supporter.

5. The government argues that we need not reach this question because even if *one* of its reasons for striking the juror was improperly based on religion, there existed another, *Batson* acceptable, reason: the juror's acquaintance with an alleged supporter of the defendant. *See* fn.4, *supra*. The problem with this argument is that while we have noted that such dual motivations can be acceptable defenses in *Batson* cases, *see, e.g., Howard v. Senkowski*, 986 F.2d 24, 30 (2d Cir.1993), we have placed the burden on the party making a dual motivation defense to demonstrate affir-

matively that it would have acted the same way *regardless* of the improper motive. *See United States v. Taylor*, 92 F.3d 1313, 1328 (2d Cir.1996) (reaffirming *Howard* and reiterating that the government bears the burden once the defense has demonstrated the presence of an improper motive). This the government has not, to date, shown.

6. Defendant appears to abandon the argument, made below, that the trial judge affirmatively prevented her counsel from fully articulating her *Batson* challenge. In any event, the record does not support such a contention.

the error and had declined to do so." *Fogarty v. Near N. Ins. Brokerage, Inc.*, 162 F.3d 74, 80 (2d Cir.1998). As a general rule, when a litigant has failed to lodge a timely objection, we may still consider her appellate arguments, but we will do so under a plain error review standard. *See, e.g., United States v. Nelson*, 277 F.3d 164, 204 (2002) ("[F]orfeiture, or failure timely to assert a right, [permits] appellate review for 'plain error' under Fed.R.Crim.P. 52(b)...."). Rule 52(b) provides: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed.R.Crim.P. 52(b).

It is not clear, however, from our recent cases, whether an unpreserved *Batson* objection permits appellate court review for plain error. The answer to this question turns on how we characterize the untimely challenge: is it waived or forfeited? Waiver—the "intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted)—extinguishes an error and obviates plain error review. Forfeiture—"the failure to make the timely assertion of a right," *id.*—does not. *See United States v. Kon Yu–Leung*, 51 F.3d 1116, 1121 (2d Cir.1995). In *McCrory*, both words are used, which appears to leave open the question.[7] And no other case in this circuit resolves the matter: none has applied plain error review in this context, and none has foreclosed such review, although post-*McCrory* cases do

tend to adopt the waiver terminology. A majority of other circuits, however, review untimely *Batson* objections for plain error. *See, e.g., United States v. Stafford*, 136 F.3d 1109 (7th Cir.1998) (applying plain error review in a case similar to this); *see also Hidalgo v. Fagen, Inc.*, 206 F.3d 1013, 1019–20 (10th Cir.2000) (failure to raise *Batson* objection in trial court results in appellate court review for plain error); *Gov't of V.I. v. Forte*, 806 F.2d 73, 76 (3rd Cir.1986) ("[W]e may notice on appeal the use of the peremptories as plain error under Rule 52(b)."). *But see James v. Bowersox*, 187 F.3d 866, 869 n. 4 (8th Cir.1999) (noting in dicta that plain error review does not apply to untimely *Batson* challenges).

Despite the waiver language in our recent cases, we believe that forfeiture is the more appropriate label.[8] Brown certainly failed timely to object, but it is not apparent from the record that she intentionally relinquished a "known right." Ultimately, however, we need not determine whether plain error review obtains in *Batson* cases generally, or in this case specifically. For the government agrees that plain error review is proper here, thereby relinquishing the argument that Brown has waived, as opposed to forfeited, her objection. *See Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir.1998) (noting that litigants can "waive[ ] the waiver point"). There is, therefore, no question that we review defendant's religion-based *Batson* objection for plain error.

---

**7.** First, the court states, "we hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection *waives* the objection." 82 F.3d at 1249 (emphasis added). Immediately thereafter, the court concludes: "As McCrory did not raise his objection to the prosecutor's use of his peremptory challenges until three and one half months after the conclusion of

jury selection, he *forfeited* his *Batson* claim." *Id.* (emphasis added).

**8.** We have previously "pause[d] to note [this] potentially confusing issue of terminology," observing that our cases "do not always clearly distinguish between" the two concepts. *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir.2000).

### 2. "Plain" error

To establish plain error, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (quoting *Olano,* 507 U.S. at 732, 113 S.Ct. 1770). If these three conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 467, 113 S.Ct. 1770 (quoting *Olano,* 507 U.S. at 732, 113 S.Ct. 1770) (internal quotations marks and citations omitted); *see United States v. Gore,* 154 F.3d 34, 42 (2d Cir.1998) (deploying *Olano* test).

In the *Batson* context, it is normally the case that the only complicated question is whether the second prong is satisfied— that is, whether the error at issue is "plain." For if we decide that the district court's approval of a challenge based on religion is error under the first prong, the third and fourth prongs of the *Olano* test are also generally met. The asserted right in question is that to equal protection of the laws, and the remedy for a violation is reversal. There is therefore usually little question that any *Batson* error we find would affect "a defendant's substantial rights the violation of which would result in manifest injustice." *United States v. Keppler,* 2 F.3d 21, 24 (2d Cir.1993) (inter-

nal quotation marks and citation omitted). For the same reason (since no court can countenance a violation of the Equal Protection Clause of the Constitution) any such error would "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732, 113 S.Ct. 1770 (internal quotation marks omitted).

What then does it mean for an error to be "plain?" The most obvious example of plain error is a trial court decision in direct contravention of governing case law. But it is not always necessary for the party alleging plain error to cite a circuit or Supreme Court precedent precisely on point. Plain error review is considerably more flexible.

Thus, "[a]n error is 'plain' if it is 'clear' or 'obvious' at the time of *appellate consideration.*" *United States v. Gordon,* 291 F.3d 181, 193 (2d Cir.2002) (citing *Johnson,* 520 U.S. at 467–68, 117 S.Ct. 1544) (emphasis added), *cert. denied,* 537 U.S. 1114, 123 S.Ct. 866, 154 L.Ed.2d 788 (2003). What is more, the "plainness" of the error can depend on well-settled legal *principles* as much as well-settled legal *precedents.* We can, in certain cases, notice plain error in the absence of direct precedent, or even where uniformity among the circuits, or among state courts, is lacking.[9] Error is plain if it is "so

---

9. Plain error review must not be confused with the standard applied by federal courts in reviewing state convictions on a writ of habeas corpus. In the habeas context, a petitioner will only prevail when the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). "[C]learly established Federal law includes only holdings of Supreme Court decisions and does not include dicta ...." *McKinney v. Artuz,* 326 F.3d 87, 96 (2d. Cir.2003) (internal quotation marks omitted). What is more, the

law must have been clearly established *prior* to state court disposition. See *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' ... refers to the holdings ... of this Court's decisions as of the time of the relevant state-court decision."). *See Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003) (applying *Williams* ).

Even under the stringent requirements of the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), however, we do not

egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." *Gore,* 154 F.3d at 42–43 (internal quotation marks and citations omitted); *see also United States v. Thomas,* 274 F.3d 655, 667 (2d Cir.2001) (en banc) (quoting *Gore* ).[10] Such instances will typically involve review of a potential *constitutional* error. *See United States v. Handakas,* 286 F.3d 92, 111 (2d Cir.) (" 'We apply the plain error rule less rigidly when reviewing a potential constitutional error.' ") (quoting *United States v. Easter,* 981 F.2d 1549, 1557 (10th Cir.1992)), *cert. denied,* 537 U.S. 894, 123 S.Ct. 168, 154 L.Ed.2d 160 (2002).

 Moreover, we will be more inclined to deem an error "plain" where it is clear from the record that failure to object below was not the result of a strategic decision. *Bayless,* 201 F.3d at 128 & n. 2 (2d Cir.2000) (noting that a plain error finding is more likely "where there is no possibility of strategic manipulation," but rather mere "inadvertence or incompetence of trial counsel").[11] Where failure to object below resulted in an incomplete record or inadequate findings, however, our review for plain error will be more rigorous. *See McCrory,* 82 F.3d at 1248 (noting the difficulty of reviewing peremptory strikes after the fact, given that "challenges are often based on ... subtle, in-

require habeas petitioners, in every case, to point to a prior holding that directly deals with the issue in their case. We still find that a state court contravened "clearly established federal law" if its decision "unreasonably failed to extend a ... Supreme Court defined ... legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d 36, 45 (2d Cir. 2002); *see also Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (Kennedy, J., plurality opinion) (stating that a "state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled").

Nor is plain error review equivalent to a qualified immunity inquiry, where we ask *whether government officials violated* "clearly established" rights. *See Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999) ("The doctrine of qualified immunity shields [officials] from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known.") (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). And even under that standard, rights can be clearly established in dicta. *See Ehrlich v. Town of Glastonbury,* 348 F.3d 48, 56 (2d Cir.2003) (noting that the Supreme Court has "ma[de] clear that ... dicta is enough to put

defendant state actors on notice that, if they repeat their acts, they will not have the benefit of qualified immunity").

In any event, plain error review, because it is concerned with efficient administration of justice *within* the federal court system, rather than issues of federalism or the conduct of executive and state officials, is even more flexible.

10. This, of course, will occur only in the rare case. As a general rule, we reserve a finding of plainness to situations where a trial court's ruling contravenes clearly established precedent. *See, e.g., United States v. Weintraub,* 273 F.3d 139, 152 (2d Cir.2001) ("Without a prior decision from this court or the Supreme Court mandating the jury instruction that [defendant], for the first time on appeal, says should have been given, we could not find any such error to be plain, if error it was."); *see also Gore,* 154 F.3d at 43, in which we noted the difficulty of—but did not close the door on—finding plain error where this circuit has not previously spoken on an issue and there is no discernible consensus among other circuits.

11. *See also Nelson,* 277 F.3d at 220 (2d Cir. 2002) (Straub, J., concurring in part and dissenting in part) (noting "the Supreme Court's warning against 'sandbagging' on the part of defense lawyers who may decline to object to a potentially unconstitutional trial procedure in order to manufacture reversible error").

tangible impressions")[12]

### 3. The current doctrine on religion-based challenges

 Against this background, we turn to the current law on religion-based challenges as applied to the case before us. The Supreme Court has not yet passed on whether religion-based peremptory challenges are unconstitutional. *See Davis v. Minnesota,* 511 U.S. 1115, 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (denying certiorari to appeal from Minnesota Supreme Court decision declining to extend *Batson* to religion). *But see id.* at 1117, 114 S.Ct. 2120 (Thomas, *J.*, joined by Scalia, *J.*, dissenting) ("Indeed, given the Court's [prior decisions], no principled reason immediately appears for declining to apply *Batson* to any strike based on a classification that is accorded heightened scrutiny under the Equal Protection Clause."). Nor has this court. In *United States v. Berger,* 224 F.3d 107, 120 (2d Cir.2000), appellants argued that "*Batson* should logically apply to a challenge allegedly based on a juror's religion." But after noting that the Supreme Court "has not explicitly extended *Batson* to religion-based peremptory challenges, and the lower courts are divided on the question," we concluded that we had no need to reach this question because the government had stricken the venire member for a religion-neutral reason—his familiarity with the dispute in the case. *Id.* Thus, *Berger* expressly left the question open.

Only one circuit has decided the issue on the merits. In *United States v. DeJesus,*

347 F.3d 500, 511 (3d Cir.2003), the Third Circuit drew a distinction "between a strike motivated by religious beliefs and one motivated by religious affiliation." Without determining the permissibility of the latter, the court held that strikes based on beliefs are valid and proper. *Id.; see also id.* at 510 (accepting the government's argument that the challenged venire members' "unusual amount of religious activity suggested strong religious beliefs, which could prevent them from convicting the defendant"). The Seventh Circuit addressed the same question in *United States v. Stafford,* 136 F.3d 1109, 1114 (7th Cir.1998), but did not resolve it because the court found no "plain" error. *See id.* (stating in dicta that "[i]t would be improper and perhaps unconstitutional to strike a juror on the basis of his being a Catholic, a Jew, a Muslim, etc.," but it would be "proper to strike him on the basis of a belief that would prevent him from basing his decision on the evidence and instructions, even if the belief had a religious backing")[13]

State courts have not been unanimous in their disposition of this issue. Since the Supreme Court decided, in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending *Batson* to gender), that *Batson* is not confined to race, a few state courts have declared invalid strikes based on religious *affiliation. See State v. Purcell,* 199 Ariz. 319, 18 P.3d 113, 120 (Ct.App.2001) (holding that *Batson* encompasses peremptory strikes grounded upon religious affiliation

---

**12.** This is also because we do not want to encourage lawyers to "test [their] fortunes with the first jury," while knowing there will be a "second round in the event of a conviction." *McCrory,* 82 F.3d at 1247.

**13.** The Fifth Circuit held, in the habeas context, that extending *Batson* to religion would create a "new rule" of constitutional law.

*Fisher v. Texas,* 169 F.3d 295, 305–06 (5th Cir.1999) ("We have no trouble concluding that reasonable jurists, considering the question in 1996, would not have felt compelled by existing precedent to rule that religion-based peremptory challenges violate the Equal Protection Clause.").

or membership); *State v. Hodge,* 248 Conn. 207, 726 A.2d 531, 552–54 (1999) (holding that *Batson* extends to religion, but "to the extent that the state's attorney had excused [a juror for] certain views that could impair his ability to decide the case" rather than simply "religious affiliation," the peremptory challenge would stand); *People v. Martin,* 64 Cal.App.4th 378, 75 Cal.Rptr.2d 147, 150–51 (1st Dist. 1998) (same).[14] The Texas Court of Criminal Appeals, on the other hand, held that religion-based peremptory challenges are not constitutionally improper. In *Casarez v. State,* 913 S.W.2d 468 (Tex.Crim.App. 1994), the court subjected the use of such strikes to strict scrutiny, but found the state's asserted interest in impartial juries compelling: "[E]xcluding prospective jurors on the basis of their religious affiliation does promote fairness and impartiality on the jury. And it does so without denigrating the dignity of any individual veniremembers." *Id.* at 495. *Casarez* built on an earlier, pre-*J.E.B.* opinion by the Minnesota Supreme Court, which similarly declined to extend *Batson* to challenges based on religious affiliation. *See State v. Davis,* 504 N.W.2d 767, 771 (Minn. 1993) ("[I]t is difficult to distinguish, in challenging a juror, between an impermissible bias on the basis of religious affiliation and a permissible religion-neutral explanation.").

Given the foregoing cases, the government argues that even a strike made strictly on the basis of religious affiliation ("I strike this venire member because she is Christian (or Muslim)", etc.) would not be "plain" error. Because there is no specific Supreme Court or Second Circuit holding on point, the government says, that should be the end of the inquiry. But this view ignores the purposes, and the attendant flexibility, of plain error review. And, while there is no direct holding, nor uniformity across a range of other circuits, certain principles articulated in recent Second Circuit and Supreme Court cases, could nonetheless establish the *plain* constitutional infirmity of at least some types of religion-based peremptory challenges.

In *United States v. Nelson,* decided after *Berger,* we confronted the question of religious discrimination in jury selection. 277 F.3d 164, 207–08 (2d Cir.2002). In rejecting the validity of race- and religion-based *jurymandering*—affirmative acts of the trial judge to ensure diverse representation on the jury—we noted that "it is beyond peradventure that the racial *and religious* reconstruction of the jury that occurred in [*Nelson*] could not constitutionally have been achieved at the instigation of the parties." *Id.* at 207 (emphasis added). There can be no doubt, we stated, about the "serious" nature of the "violation of equal protection that occurs when a person is excluded from a jury on the basis of his race (or religion.)" *Id.*[15] While the government is correct that these statements were dicta, they reflect important considerations that lie at the heart of *Batson* and its progeny and offer guidance on the issue before us today.

First, the "defendant [has] the right to be tried by a jury whose members

**14.** Some state courts would forbid such challenges solely on state constitutional grounds. *See, e.g., State v. Fuller,* 356 N.J.Super. 266, 812 A.2d 389, 396–97 (2002) (noting that exclusion of jurors based on religious affiliation would violate the state constitution's Equal Protection Clause, but holding that the exclusion at issue was not so based).

**15.** Ultimately, the "significance of a jury in our polity as a body chosen apart from racial and religious manipulations is too great to permit categorization by race or religion even from the best of intentions." *Id.* at 207–08.

are selected pursuant to non-discriminatory criteria." *Batson,* 476 U.S. at 85–86, 106 S.Ct. 1712. Second, this maxim is not limited to discrimination on the basis of race. Thus, in *J.E.B. v. Alabama,* the Supreme Court held that the Equal Protection Clause bars peremptory challenges based on gender, and strongly suggested a similar prohibition on strikes based on any other classification receiving heightened or strict scrutiny under the Clause. 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89.[16] And it stated further that litigants and jurors have a general equal protection right to "jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *Id.* at 128, 114 S.Ct. 1419. Third, such strikes are impermissible because we cannot countenance "unconstitutional prox[ies] for juror competence and impartiality." *Id.* at 129, 114 S.Ct. 1419.[17] And the state's mere assertion of a need to preserve fair and impartial juries will not save strikes based on group affiliation from invalidation. *Id.* at 138, 114 S.Ct. 1419 ("We shall not accept as a defense to gender-based peremptory challenges 'the very stereotype the law condemns.'") (quoting *Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

The Supreme Court has eloquently applied these principles in the race and gender contexts. We believe that they apply as plainly to jury selection based solely on a venire member's religious affiliation. *See Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002) ("*Batson* must be read as not only prohibiting certain specific actions, but also as creating a broad standard or principle that the courts must, in reason, follow."). Religion, like race and gender, is an "impermissible consideration" in government decision-making. *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000) (proscribing government employment decisions "based on impermissible considerations such as race, [or] religion") (internal quotation marks omitted); *see also United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("[T]he decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification.") (internal quotation marks omitted). And religious classifications, concededly, trigger strict scrutiny. See *Friedman v. Rogers,* 440 U.S. 1, 18, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (indicating that such scrutiny applies to classifications "drawn upon inherently suspect distinctions such as race, re-

---

**16.** After noting that, under its "equal protection jurisprudence, gender-based classifications require 'an exceedingly persuasive justification' in order to survive constitutional scrutiny," the Court asked itself whether "peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury." *J.E.B.,* 511 U.S. at 136–37, 114 S.Ct. 1419. The answer it gave was no. The Court did, however, reaffirm that "[p]arties may ... exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review." *Id.* at 143, 114 S.Ct. 1419.

**17.** Put another way, "[j]ury competence is an individual rather than a group or class mat-

ter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." *Thiel v. S. Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). In *Thiel,* the Court also wrote: "This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." *Id.*

ligion, or alienage"); *see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. Amos,* 483 U.S. 327, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).[18]

Exercising peremptory strikes simply because a venire member affiliates herself with a certain religion is therefore a form of "state-sponsored group stereotype[ ] rooted in, and reflective of, historical prejudice." *J.E.B.,* 511 U.S. at 128, 114 S.Ct. 1419. Such strikes, like those based on race and gender, "cause[ ] harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *Id.* at 140, 114 S.Ct. 1419. That harm flows directly from "the [government's] participation in the perpetuation of [these] invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." *Id.*

In *Nelson,* we noted in dicta our clear belief, shaped by the foregoing principles, that parties cannot be permitted to strike a juror simply based on his religion. We reaffirm that here. Thus, if a prosecutor, when challenged, said that he had stricken a juror because she was Muslim, or Catholic, or evangelical, upholding such a strike would be error. Moreover, such an error would be plain. Given the relevant principles, as stated in *Batson* and *J.E.B.,* it would be sufficiently "obvious," and given the stakes, sufficiently "egregious," to meet the second prong of the *Olano* test.

The reason given for the peremptory challenge in this case, however, is not so simple. It is far from clear what the prosecutor meant by "people very active in church groups." Nor can we immediately discern his rationale for inferring that such people have trouble judging others. What is clear is that, like Ms. Saliba, the wife of a pastor who also suggested that she was deeply involved in the work of her church, Ms. Underwood stood out from other venire members because of her religious *activities,* not her membership in a Christian congregation. The prosecutor's focus on activism, rather than belief or affiliation, is reflected in his decision *not* to strike at least two other venire members who identified themselves as Christians, but did not express the same degree of participation in religious activities.

Differentiating among prospective jurors on the basis of their activities does not plainly implicate the same unconstitutional proxies as distinctions based solely on religious identity. The prosecutor may well have believed that people active in church groups engage in charitable pursuits, public service activities, and support groups. Thus, he described Ms. Underwood and Ms. Saliba, during jury selection, as the "first [people] I'd call on the phone" if "I had an illness in the family." And he might well have thought that these good works, in turn, would likely increase their sympathy for people in distress, including criminal defendants.

This may be a dubious inference, but that does not make it an unconstitutional one. Avid participation in *secular* charita-

---

**18.** Unlike the race and gender contexts, religious discrimination challenges are rarely brought under the equal protection clause, thanks to the existence of the First Amendment. First Amendment free exercise and establishment clause cases, however, also turn on application of strict scrutiny. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v.* *City of Hialeah,* 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (law challenged as a burden on free exercise subject to strict scrutiny); *Larson v. Valente,* 456 U.S. 228, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (holding same with respect to establishment clause).

ble enterprises can give rise to the same inference: that individuals who devote themselves to aiding the alienated elements of our society, for whatever reason, are more likely to be sympathetic to defendants. As a result, one would expect a prosecutor, who held such a view, to strike the "religious activist" in one case, while in the next case, and on the same assumption, to strike a secular activist. Consider the analogous case in which a prosecutor strikes a black community organizer who is committed to various social causes, including racial justice, on the ground that such organizers often have or develop strong opinions on issues relevant to the trial at hand. If the court determines that the prosecutor would, for the same reason, strike a white community organizer committed to the same causes, then the peremptory challenge is not based on a *Batson* suspect ground. *Cf. United States v. Thomas,* 303 F.3d 138, 145 (2d Cir.2002) ("Support for the notion that there was purposeful discrimination in the peremptory challenge may lie in the similarity between the characteristics of jurors struck and jurors accepted. Where the principal difference between them is race [or, in the instant case, religion], the credibility of the prosecutor's explanation is much weakened.") (internal quotation marks omitted). We cannot, in view of this, conclude that permitting the striking of a religious activist was, without more, plainly erroneous, if erroneous at all.

Of course, the possibility remains that the prosecutor was primarily driven by the assumption that particularly active churchgoers are more likely to hold certain religious *beliefs.* But we cannot say that it was plain error to conclude that he was not. We cannot do so, in part, because of the defendant's failure to raise any objection (based on religion) to the prosecutor's explanation. Indeed, this case illustrates one of the critical reasons why we subject forfeited claims to plain error review. The trial court did not have the opportunity, at the time of jury selection, to conduct an inquiry into the prosecutor's reasons for exercising this challenge, and thereby to determine whether they were sufficiently religion-neutral. *McCrory,* 82 F.3d at 1246–47. And now, on appeal, we lack adequate evidence to characterize the strike.

Ultimately, the basis for the challenge is ambiguous enough so that any error the judge might have committed in permitting the strike was not "obvious" or "egregious." *See Gore,* 154 F.3d at 43. Put another way, wherever one draws the line between an improper challenge on account of religion and a possibly proper one that is based on participation in religious activities, we cannot say that the court plainly erred in finding that the strike made here fell on the constitutionally permissible side of that line.[19]

19. The Third and Seventh Circuits, in considering religion connected peremptory challenges, have focused exclusively on the distinction between affiliation and belief. Thus, the Seventh Circuit stated:

It is necessary to distinguish among religious affiliation, a religion's general tenets, and a specific religious belief. It would be improper and perhaps unconstitutional to strike a juror on the basis of his being a Catholic, a Jew, a Muslim, etc. It would be proper to strike him on the basis of a belief that would prevent him from basing his

decision on the evidence and instructions, even if the belief had a religious backing; suppose for example that his religion taught that crimes should be left entirely to the justice of God. In between and most difficult to evaluate from the standpoint of *Batson* is a religious outlook that might make the prospective juror unusually reluctant, or unusually eager, to convict a criminal defendant. That appears to be this case. *Stafford,* 136 F.3d at 1114. Similarly, while the Third Circuit initially noted the stricken venire members' "unusual amount of reli-

*Conclusion*

We find no error in the district court's decision to deny Deborah Brown's race-based *Batson* challenge, and no plain error in the court's decision to deny her religion-based *Batson* challenge. Accordingly, the judgment of the district court is AFFIRMED.

gious activity," it based its decision entirely on the "heightened religiosity" and "strong religious beliefs" of the potential jurors stricken. *DeJesus,* 347 F.3d at 509–11. Since our decision today does not turn on the distinction these courts made, we express no views on that distinction.