Marshall **HIGHLER**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 02A03–0505–CR–203.

Court of Appeals of Indiana.

Sept. 15, 2005.

Transfer Granted Dec. 1, 2005.

P. Stephen Miller, Fort Wayne, for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant Marshall Highler ("Highler") appeals his conviction for Rape as a Class B felony.[1] We affirm.

1. Ind.Code § 35–42–4–1.

### Issues

On appeal, Highler raises three issues, which we reorder and restate as:

I. Whether the jury selection system in Allen County deprived Highler of the right to a trial by a jury of his peers in violation of the Sixth and Fourteenth Amendments;

II. Whether the trial court improperly upheld the State's peremptory challenge to the only African–American venire person merely because the State offered a race-neutral, but religious discriminatory, reason for the strike; and

III. Whether the trial court abused its discretion by admitting certain evidence at trial.

### Facts and Procedural History

On October 10, 2003, S.B. was invited to a party by her co-worker, and Highler's girlfriend, Maria. S.B. invited Shane Merrill ("Merrill") to accompany her to the party. Upon her arrival at the party, S.B. had half of "[a] beer and a shot of Hennessey." Tr. at 153. S.B. then left the party and walked to a nearby liquor store to buy some vodka. When S.B. returned to the party, she drank approximately five or six shots of vodka and took four or five puffs from a marijuana cigarette. At some point during the early morning hours of October 11, 2003, S.B. started feeling "[d]izzy, nauseous, and wobbly." *Id.* at 159. After vomiting in the bathroom, S.B. went to one of the bedrooms and lay down on the bed. S.B. does not remember going to bed but she does remember waking up, fully clothed, with Highler in the room with her. Highler talked to S.B., but she was too

groggy to understand what he was saying. He also gave S.B. some water to drink, which she spilled on herself.

Apparently, S.B. fell back to sleep. She awoke a couple of times and discovered that she was alone in the bedroom. However, one time when she awoke, "she looked up and there was somebody standing over the bed.... Then [she] felt ... it felt like [her] belt buckle was being undone and [her] pants sliding down." *Id.* at 162. S.B. thought that she was dreaming until Highler climbed into bed with her, put his knees between her legs, and spread her legs apart. In response, S.B. "kept saying stop, stop, and he wouldn't stop." *Id.* at 163. Highler put all of his weight on S.B. and said, "you feel so good, you feel so good." *Id.* S.B. tried to move and push him off, but Highler "just put more weight on [her.]" *Id.* at 164. Highler placed his penis inside S.B.'s vagina and kept "pushing back and forth." *Id.* at 166. Highler also forced his tongue into S.B.'s mouth. When Highler finished having sexual intercourse with S.B., he removed his penis from her vagina and ejaculated onto her stomach. Highler then left the bedroom and S.B. started to cry.

In a videotaped interview, Merrill testified that, before S.B. became ill, she was "pretty well gone," i.e., "extremely intoxicated." State's Ex. 12. Indeed, Merrill, Highler, and some other individuals had to physically help S.B. to the bathroom, where she vomited. Subsequently, Merrill had to carry S.B. to the bedroom and put her into bed. Merrill also testified that, while S.B. was sleeping, Highler asked Merrill, i.e., S.B.'s date, if Highler and "Nacho"—the host of the party—could have sex with S.B. Merrill responded that, because of S.B.'s intoxicated condition, having sex with her would be against the law. Nacho retorted that he and Highler could slit Merrill's throat. Highler gave

Merrill three options: (1) join them in having sexual intercourse with S.B.; (2) leave; or (3) fight. Merrill left, called S.B.'s father for help, and waited approximately ten minutes for her father's friend, Jason Shanyfelt ("Shanyfelt"), to arrive. Once help arrived and Merrill reentered the apartment, he saw Highler smoking a cigarette and noticed that S.B. was very upset. Highler spontaneously exclaimed that he had not done anything to S.B.

S.B. was angry with Merrill because, during the sexual encounter, she had yelled for him but no one came to her rescue. Merrill came into the room and helped S.B. out of bed. Shanyfelt noticed that S.B. appeared "very not with it." *Id.* at 199. In Shanyfelt's opinion, S.B.'s shirt was pulled up, "just straggly," and she was very emotional—crying, sobbing, and clinging onto Merrill for help. At that point, Merrill, S.B., and Shanyfelt left the party. Merrill dialed 9-1-1 and handed S.B. the telephone.

As a result of the incident, S.B.'s vaginal area, shoulders, and stomach hurt. S.B. sought help at the Sexual Assault Treatment Center, once for an examination and twice for a check to see if her wounds had healed.

On or about October 16, 2003, the State charged Highler with rape as a Class B felony. On August 17, 2004, during voir dire, Highler objected to the State's peremptory challenge to Juror 92—i.e., the only African–American venire person—pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In response to Highler's objection, the State proffered the following reason for challenging Juror 92:

First of all Your Honor, in his profession he's a Pastor and I never take any Pastors, Ministers, Reverends, [or] Priests on my jury panels just because they're more apt for forgiveness. But in

addition to that Your Honor, I was highly disturbed by his questionnaire, in fact in reviewing my question is, I already marked off that I was going to strike him as a juror before he even came to this courtroom, before I knew anything about his race, I had already marked that I was going to take him. He indicated through his questions, first he marked, is there any reason you cannot served on a jury, he marked yes. To see the back. Based on the answer to this question indicating his feelings about cases and the way they're handled in Allen County, and based on his last statement that he prefers, he does not want any part of this process, Your Honor, I understand what he said here today, however, the State is highly concerned about his ability to be fair and impartial to the State and I would ask that he be struck. I don't think it's sufficient to strike for cause but I think I can use my peremptory challenge and I do have that concern, not being any type of race issue.

Tr. at 88–89. Finding that the State's reason was race-neutral, the trial court excused Juror 92 from service. The trial court also overruled Highler's objection that the composition of the venire did not reflect a fair cross-section of the community.

During trial, Highler admitted having sexual intercourse with S.B., but urged that it was consensual. Midway through the trial, Highler objected to the admission of the 9-1-1 telephone conversation on grounds that the tape's prejudicial nature substantially outweighed its probative value. The trial court admitted the tape into evidence over Highler's objection, with the following admonishment:

Ladies and gentlemen, I'm going to admit State's 13 and it's going to be published, that is played for you, the 911 tape. I would direct you or admonish you that nothing in this tape should be accepted for the truth of the statements made but rather simply that the statements were made. For instance and specifically, the majority of the conversation is from [Merrill,] the video that you just saw of his call to 911, and he makes numerous references, particularly early in the call that the alleged victim was raped. You should not accept that for the truth of it but rather simply that he said that. And I hope you understand that distinction because it can be a significant one for your ultimate deliberations.

Tr. at 400.

At the conclusion of the trial, the jury found Highler guilty of rape as a Class B felony. The trial court entered a judgment of conviction on the jury's verdict and sentenced Highler to ten years in the Indiana Department of Correction for his rape conviction. Highler now appeals.

**Discussion and Decision**

*I. Denial of the Right to a Jury of Peers: Fair Cross–Section of the Community*

On appeal, Highler first argues that he was denied a trial by a jury of his peers in violation of the Sixth and Fourteenth Amendments to the United States Constitution. The United States Supreme Court has long held that the selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *See Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *see also Wilder v. State,* 813 N.E.2d 788, 791 (Ind.Ct.App.2004), *trans. denied, overruled on other grounds by Laux v. State,* 821 N.E.2d 816, 820 n.4 (Ind.2005). The jury selection process should operate to reflect a reasonable cross-section of the community from which

it is drawn. *Wilder*, 813 N.E.2d at 791 (citing *Moore v. State*, 427 N.E.2d 1135, 1137 (Ind.Ct.App.1981)). Jury panels are not required, however, to be a microcosm of a county or a court district. *Peoples v. State*, 649 N.E.2d 638, 639 (Ind.Ct.App. 1995). Indeed, jurors need not be mathematically proportioned to the character of the community and, further, there is no requirement that any particular class be represented on every jury. *Wilder*, 813 N.E.2d at 791 (citing *Daniels v. State*, 274 Ind. 29, 34–35, 408 N.E.2d 1244, 1247 (1980)). Instead, the main requirement is that the jury selection not be arbitrary. *Wilder*, 813 N.E.2d at 791.

▪▪▪ The burden of demonstrating purposeful discrimination is on the defendant. *Id.* To establish a prima facie violation of the fair cross-section requirement, the defendant is required to demonstrate that: (1) the group being excluded is a distinctive group in the community; (2) the representation of this group in jury pools from which juries are being selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this under-representation is caused by systematic exclusion. *Duren v. Missouri*, 439 U.S. 357, 362–64, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).[2]

In the present case, Highler argues that the Allen County jury selection system excludes African–American individuals from serving on the petit jury. The parties agree that African–Americans are a distinctive group in the community, comprising 17.4% of the Fort Wayne population. *See, e.g., Fields v. State*, 679 N.E.2d 1315, 1318 (Ind.1997) (holding that African–Americans constitute a distinctive group in the community). The State contends, however, that Highler has failed to satisfy the second and third prongs necessary to establish a prima facie violation, i.e., a *Duren* violation. We concentrate our analysis on the third prong.

The method by which jury pools are selected in Indiana is governed by statute. Indiana Code Section 33–28–4–3(e) allows jury commissioners to use a computerized jury selection system, but requires that the system employed "must be fair and may not violate the rights of persons with respect to the impartial and random selection of prospective jurors."[3] The Indiana Supreme Court has held that the purpose of the jury selection statute is to ensure that the method used to select a jury is not arbitrary and does not result in the systematic exclusion of any group. *Azania v. State*, 778 N.E.2d 1253, 1256–57 (Ind.2002); *see also Shack v. State*, 259 Ind. 450, 459–60, 288 N.E.2d 155, 162 (1972).

In *Azania*, 778 N.E.2d at 1260, our Supreme Court discussed two tests under the

**2.** Once the defendant makes a prima facie showing that he or she has been denied the right to have a jury drawn from a fair cross-section of the community, the State may still justify the selection process by showing that attainment of a fair cross-section is incompatible with a significant state interest. *Wilder*, 813 N.E.2d at 792. The burden of proof, however, for this latter proposition rests with the State and is not implicated in the present controversy. *Id.*

**3.** Indiana Code Section 33–28–4–3(e) provides:

Subject to appropriations made by the county fiscal body, the jury commissioners may use a computerized jury selection system. However, the system used for the selection system must be fair and may not violate the rights of persons with respect to the impartial and random selection of prospective jurors. The jurors selected under the computerized jury selection system must be eligible for selection under this chapter. The commissioners shall deliver the names of the individuals selected to the clerk of the circuit court. The commissioners shall observe their oath in all activities taken under this subsection.

Sixth Amendment to determine if a jury pool adequately represents the community. The "Absolute Disparity Test" measures the difference between the percentage of the distinctive group eligible for jury duty and the percentage in the pool. *Id.* .at 1260. The second test is the "Comparative Disparity Test," which is calculated by dividing the absolute disparity by the percentage of the group eligible for jury duty. *Id.*

Highler claims that of the forty-seven persons in his venire, only one was an African–American. Based upon 2000 census information, Highler determined that the African–American population in Allen County is 17.4%. Therefore, Highler asserts, there is a 15.3% absolute disparity [4] and an 88% comparative disparity [5] between the percentage of the distinct group of African–Americans aged eighteen years or older who are eligible for jury duty in Allen County and the percentage of African–Americans actually present in his venire.

■■ Although African–Americans may have been under-represented in the jury pool in this particular case, Highler has provided no evidence to suggest that jury pools in Allen County systematically exclude African–Americans. Indeed, as previously mentioned, there is no requirement that any particular segment of the population be represented on every jury, and completely random selection of jurors is not required as long as the system used is impartial and not arbitrary. *Azania,* 778 N.E.2d at 1257. Minor irregularities will not constitute reversible error unless there is a showing of substantial prejudice to the defendant's rights as a result of such irregularities. *Id.* (citing *Porter v. State,* 271 Ind. 180, 201, 391 N.E.2d 801, 816 (1979), *overruled on other grounds by Fleener v. State,* 274 Ind. 473, 412 N.E.2d 778 (1980)). If there is a lack of substantial compliance, however, the accused need not show actual prejudice. *Cross v. State,* 272 Ind. 223, 226, 397 N.E.2d 265, 268 (1979).

In the present case, the record reveals that the jury selection system in Allen County has been reformed since 1996,[6] to comply with Indiana Code 33–28–4–3. As a result, potential jurors are selected from voter registration and Bureau of Motor Vehicle ("BMV") records. *See* Ind.Code §§ 33–28–4–3(a), -(f), and -(g) (requiring jury commissioners to select grand and petit jurors from the names of legal voters and *allowing* the commissioners to supplement voter registration lists with motor vehicle registration lists). The computerized selection of potential jurors from voter registration lists and BMV records is sufficient to satisfy the statutory and con-

---

4. The absolute disparity, in this case, is equal to 17.4% minus 2.1% (i.e., 1 divided by 47) or 15.3%.

5. The comparative disparity, in the present case, is equal to 15.3% divided by 17.4% or approximately 88%.

6. In *Azania,* our Supreme Court described the constitutional problems inherent in the Allen County jury selection system or program, in 1996, as follows:

The number of jurors needed for 1996 was first identified as 14,000. The program then selected 14,364 registered voters to be assigned a random number. Only persons assigned a number could be drawn for a panel. The assignment stopped after 10,000 voters had received numbers. Because the program worked through the voter list by township in alphabetical order, all of the excluded 4364 registered voters were Wayne Township residents. As a result, 87% of Wayne Township was excluded. This had a materially disproportionate effect on African–Americans because African–Americans comprised 8.5% of the total population of Allen County, and three fourths of that 8.5% resided in Wayne Township.
778 N.E.2d at 1257.

stitutional requirements. *Dye v. State,* 717 N.E.2d 5, 19 (Ind.1999) (holding that computerized selection of potential jurors from voter registration lists alone, without additional use of tax lists, is sufficient to satisfy the statutory and constitutional requirements), *reh'g denied, cert. denied,* 531 U.S. 957, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000). Because Highler has failed to carry his burden of proving systematic exclusion to satisfy the third part of the *Duren* test, his claim that he was denied the right to a jury of his peers must fail.

## II. *Improper Use of a Peremptory Strike: Juror 92*

### A. *Race*

■ Highler next contends that the trial court erred by determining that Juror 92 was struck for race-neutral reasons. The exercise of racially discriminatory peremptory challenges is constitutionally impermissible. *Wright v. State,* 690 N.E.2d 1098, 1104 (Ind.1997), *reh'g denied.* To establish a prima facie case of purposeful discrimination in the selection of a jury, a defendant must show: (1) that the prosecutor has exercised peremptory challenges to remove members of a cognizable racial group from the venire; and (2) that the facts and circumstances of the defendant's case raise an inference that the prosecutor used that practice to exclude venire persons from the jury due to their race. *Bradley v. State,* 649 N.E.2d 100, 105 (Ind. 1995) (citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)), *reh'g denied.* The removal of some African–American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination. *McCormick v. State,* 803 N.E.2d 1108, 1111 (Ind.2004). However, the removal of "the only ... African American juror that could have served on the petit jury" does "raise an inference that the juror was excluded

on the basis of race." *Id.* (quoting *McCants v. State,* 686 N.E.2d 1281, 1284 (Ind.1997)); *see also Ashabraner v. Bowers,* 753 N.E.2d 662, 667 (Ind.2001) (noting that the preemptory removal of the "only black member of the panel" standing alone "establishes a prima facie case" of discrimination).

■ Once a prima facie showing has been established, the burden shifts to the State to present an explanation for challenging such jurors. *Batson,* 476 U.S. at 97, 106 S.Ct. 1712. While it is true that peremptory challenges are often the subjects of instinct—making the articulation of a reason difficult—when illegitimate grounds like race are at issue, "a prosecutor simply has got to state his [or her] reasons as best he [or she] can and stand or fall on the plausibility of the reasons" given. *Miller–El v. Dretke,* —— U.S. ——, —— – ——, 125 S.Ct. 2317, 2332–33, 162 L.Ed.2d 196 (2005). Indeed, "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Id.* at 2333. After the State offers a justification for the challenge, the trial court has a duty to determine whether the defendant has established purposeful discrimination. *McCormick,* 803 N.E.2d at 1110.

■ Here, the State used a peremptory challenge to remove Juror 92, the only African–American venire person on the panel. Thus, Highler made at least a prima facie showing of purposeful discrimination in the jury selection process. *See, e.g., Ashabraner,* 753 N.E.2d at 667. Nevertheless, where as here, a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of inten-

tional discrimination, the preliminary issue of whether the defendant had made a prima facie showing of purposeful discrimination becomes moot. *McCormick,* 803 N.E.2d at 1111.

 Instead, we examine the State's proffered explanation to determine whether it is indeed race-neutral. *Id.* A neutral explanation is "an explanation based on something other than the race of the juror." *Id.* (citations omitted). In the present case, the State gave the following explanation for its use of a peremptory strike against Juror 92:

> First of all Your Honor, in his profession he's a Pastor and I never take any Pastors, Ministers, Reverends, [or] Priests on my jury panels just because they're more apt for forgiveness. But in addition to that Your Honor, I was highly disturbed by his questionnaire, in fact in reviewing my question is, I already marked off that I was going to strike him as a juror before he even came to this courtroom, before I knew anything about his race, I had already marked that I was [sic] going to take him. . . . Your Honor, I understand what he said here today, however, the State is highly concerned about his ability to be fair and impartial to the State and I would ask that he be struck. I don't think it's sufficient to strike for cause but I think I can use my peremptory challenge and I do have that concern, not being any type of race issue.

Tr. at 88–89.

The evidence reveals that, prior to trial, Juror 92 completed a juror questionnaire, wherein he indicated that he "ha[s] a problem that would prevent [him] from serving as a juror." Ex. A. Specifically, Juror 92 wrote:

> My problem is I have sat in on some cases in Allen Co. Court Room and have not been pleased with the way many cases have been handled. In more than one case it seem's [sic] as if their [sic] are at lease [sic] to [sic] sets of Law Book[:] Poor and Rich and Black and White. I have seen cases decided before court ever starts, and to be real honest I perfer [sic] not to be part of your process.

*Id.* On the questionnaire, Juror 92 also indicated that he was employed as a Pastor at the "1st Redeemed By The Blood Church." *Id.*

Further, during voir dire, the following colloquy occurred between the State and Juror 92:

> Q: Okay. I want to make sure I don't miss anybody. Okay, we do obviously get our questionnaires and gentleman 92, I noticed you indicated in your remark comments that you don't have a whole lot of faith in the criminal justice system.
>
> Juror Number [92: [7]] No, my response was I've sat on, I've sat in the courtroom on more than one case, and sometimes the system seemingly doesn't give the Defendant a fair opportunity. That was my response.
>
> Q: Okay. And then you indicated that you did not want to be a part of this process. Am I accurate?
>
> Juror Number 92: Yes.
>
> Q: Is that still your feeling sir?
>
> Juror Number 92: My feelings [sic] is, based on facts and evidence if a people, if a person can be either proven guilty or innocent based on the facts and the evidence presented, then I don't have a problem with the process.

---

7. The transcript identifies Juror 92 as "Juror Number 46." Tr. at 74. However, in context, it is clear that the number "46" should have been "92."

Q: You understand that I'm a Deputy Prosecutor, right?

Juror Number 92: I understand.

Q: And you understand my job is to produce evidence to convince you that the Defendant committed a crime.

Juror Number 92: I understand your job.

Q: Okay. Now do you understand that my concern when I read your questionnaire that I think you may already... the deck may be stacked against me at even convincing you that something happened. Do you understand my feelings about that?

Juror Number 92: I understand your feelings but my remarks was not made to a prosecutor, it was made towards the system.

Q A system that I'm part of.

Juror Number 92: But not necessarily my response was not directed towards the prosecutor, it was directed towards the system. Whether it be the Judge or who ever. It does not give a defendant proper, I guess, proper judgment. I mean, sometimes a case can be narrowed down to just one person's decision. And sometimes it's not always reasonable doubt. It's not always a jury trial. So my response was not necessarily pertaining to a jury trial.

Q: Okay. But you also indicated that in your opinion the poor don't get a fair trial. Don't get a fair shake in the system.

Juror Number 92: Well, in some cases they don't. I mean, if you can't afford proper legal representation and you don't always get an opportunity that money affords people.

Tr. at 74–76.

Later, during a discussion with Highler's counsel, Juror 92 clarified his position as follows:

Q: ... Number 92 sir. The prosecutor asked you about someone, the statements or remarks that you wrote on this form that you filled out and if I understood you correctly and I don't want to put words in your mouth, but you indicated under the remarks section, you were being critical of maybe the justice system as a whole, not critical of the prosecutor, but it was the system as a whole, and you suggested, I mean, that maybe the rich and the poor get treated desparically (sic) if they're the Defendant, is that correct?

Juror Number 92: Let me say it like this.

Q: Yes, please.

Juror Number 92: I'm a member of True Faith Legal and because of True Faith Legal it gives me representation to attorneys that may be otherwise I wouldn't have an opportunity to afford, and I just feel like when you are able to hire proper representation then the better changes [sic] you stand of having a successful, so my march for, if somebody is in the courtroom and they have, say for instance a public defender that runs in at the last minute and somebody hands him a folder and says okay, this is Joe Blow and he's your client for this morning, versus me being able to properly hire an attorney and verbalize my input to the case, I think my chances would be better with an attorney that's familiar with my case versus someone that's not familiar with my case. So my march was sometime in the system people that are not able to afford proper representation sometime in the courtroom, they get the short end of the stick if they're not represented by counsel.

Q: And I appreciate your clearing that up and so I can make sure I understand you, and the State understand you and the Judge understand you that you're basically talking about maybe an adage that some of these folks agree with, you get a better lawyer, you got a better chance. You get a lawyer that's familiar with the case, you get a better lawyer you're probably going to have a better chance. If you get a lawyer that's unfamiliar with the case, or not a very good lawyer, well you don't have as good a chance. Is that correct?

Juror Number 92: That's a good assumption.

Q: Okay. Let me ask you this, you talked about a pre-paid legal and the prosecutor asked you some questions and you heard the Judge ask you, is there anything, anything at all in your mind or that can prevent you from considering the facts of this case, considering the instructions the Judge gives you in rendering a fair and impartial verdict, whether it be a verdict of guilty or not guilty, I mean, is there anything that's is going to prevent you from doing that in regard to your feelings about the system?

Juror Number 92: No sir.

*Id.* at 82–84.

██ In light of Juror 92's comments, viewed as a whole, we conclude that the State proffered a permissible race-neutral explanation for the exercise of a peremptory challenge. Indeed, by accepting the State's race-neutral explanation, the trial court found no discriminatory intent. *See Kent v. State,* 675 N.E.2d 332, 340 (Ind. 1996). Because the finding regarding discriminatory intent is a factual matter reserved for the trial court, we accord the trial court's finding great deference. *See Bradley v. State,* 649 N.E.2d 100, 105 (Ind. 1995) (citing *Batson,* 476 U.S. at 98, 106 S.Ct. 1712), *reh'g denied.* Accordingly, because the State offered a race-neutral explanation for its peremptory strike and, further, because the trial court found no discriminatory intent on behalf of the State, we hold that the trial court did not err by granting the State's peremptory challenge on the basis of race.

### B. Religion

██ In the alternative, Highler raises the more interesting question—at least on these facts—of whether it was proper for the State to use a peremptory challenge to exclude Juror 92 on the basis of his religious beliefs or affiliations.[8] In addressing

8. Initially, we observe that, at trial, Highler did not object to the peremptory strike of Juror 92 on grounds that it discriminated against a person with religious affiliations. Generally, a party may not object on one ground at trial and raise a different ground on appeal. *Brown v. State,* 728 N.E.2d 876, 878 (Ind.2000). On appeal, however, the State does not argue that Highler waived the issue of religious discrimination and, instead, responds to his contention on the merits. In *Bunch v. State,* 778 N.E.2d 1285, 1287 (Ind. 2002), our Supreme Court distinguished between "waiver as an affirmative defense" and "waiver by procedural default." In particular, the *Bunch* court clarified that, because waiver as an affirmative defense is governed by Indiana Trial Rule 8(C)—which requires parties to plead waiver as an affirmative defense and, as a consequence, places the burden of proof at trial on the party asserting such affirmative defense—it is only applicable in circumstances where the party asserting waiver has argued such defense before the lower court. *Id.* By contrast, the latter form of waiver, which is more appropriately described as "procedural default" or "forfeiture," is a doctrine of judicial administration whereby appellate courts *may sua sponte* find an issue foreclosed under a variety of circumstances in which a party has failed to take the necessary steps to preserve the issue. *Id.* (citations omitted). Because we find that the issue presented is of importance, we choose

this issue, we note that, here, the State did not strike Juror 92 because he held a particular religious belief or affiliation. Rather, the prosecutor struck the juror in question, in part, because he is a pastor and, as a matter of course, the prosecutor does not "take any Pastors, Ministers, Reverends, [or] Priests on my jury panels just because they're more apt for forgiveness." Tr. at 88. Thus, the issue presented becomes, more generally, whether it is proper to use a peremptory challenge to exclude members—in this case leaders—of a religious group or those perceived as having religious affiliations from the jury, without regard to the particular group or affiliation.

In addressing this issue, we first observe that the United States Supreme Court has not considered whether a peremptory strike based upon religious affiliation violates the federal constitution. *See Davis v. Minnesota*, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (denying certiorari on this precise issue); *see also Williams v. State*, 830 N.E.2d 107, 111 n. 1 (Ind.Ct.App.2005). For more than a century, however, the United States Supreme Court has recognized that jury selection is subject to the guarantees of the Equal Protection Clause of the Federal Constitution. *See, e.g., Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879) (in the context of race), *abrogated by Taylor*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690; *see also Batson*, 476 U.S. at 92–93, 106 S.Ct. 1712 (in the context of race). The *Batson* court explained that although a defendant has "no right to a 'petit jury composed in whole or in part of persons of his own race,'" the "defendant does have the right to be tried by a jury whose members are selected pursuant to nondis-

criminatory criteria." 476 U.S. at 85–86, 106 S.Ct. 1712 (quotations omitted).

Following *Batson*, the Supreme Court has reaffirmed its commitment to jury selection procedures that are fair and nondiscriminatory. In particular, it has recognized that whether the trial is criminal or civil, potential jurors—as well as litigants—have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice. *See Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (prohibiting race-based strikes by criminal defendants); *Powers v. Ohio*, 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that a criminal defendant can raise a third-party equal protection claim on behalf of jurors excluded by the prosecution because of their race); *and Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (prohibiting race-based strikes by civil litigants).

In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Court extended *Batson* to gender issues, holding that gender, like race, is an unconstitutional proxy for juror competence and impartiality. In so doing, the Court employed traditional equal protection analysis, observing that "the only question is whether discrimination on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial trial." *Id.* at 136–37, 114 S.Ct. 1419. The *J.E.B.* Court rejected the justification offered by the state that jurors would be likely to sympathize along gender lines in a paternity action, declaring that "[w]e shall not accept as a defense to gender-based per-

not to apply the doctrine of procedural default and will, instead, decide the issue on the merits. *See, e.g., State v. Palmer*, 496 N.E.2d

1337, 1341 (Ind.Ct.App.1986) (in the context of waiver).

emptory challenges the very stereotype the law condemns." *Id.* at 138, 114 S.Ct. 1419 (internal quotations omitted). Emphasizing the harm that race or gender-based discrimination in jury selection causes "the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process," the Court reasoned that "[f]ailing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of *Batson* itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination." *Id.* at 140, 145, 114 S.Ct. 1419.

Moreover, the *J.E.B.* Court noted:

Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system. It not only furthers the goals of the jury system. It reaffirms the promise of equality under the law—that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy.... [T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. As with race, the core guarantee of equal protection, ensuring citizens that their State will not discriminate ... would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' [gender].

*Id.* at 145–46, 114 S.Ct. 1419 (citations and internal quotation marks omitted). In extending *Batson* to gender-based classifica-

tions, which are met with heightened scrutiny, the Court expressly rejected the claim that its holding was likely to result in the elimination of all peremptory challenges, recognizing that "[p]arties may ... exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review." *Id.* at 143, 114 S.Ct. 1419.

Subsequently, the United States Supreme Court denied certiorari in a case where the prosecutor's race-neutral explanation for using a peremptory strike concerned the prospective juror's religious beliefs.[9] *Davis*, 511 U.S. at 1117, 114 S.Ct. 2120. There, the prosecutor asserted that she had struck the prospective juror because he was a Jehovah's Witness and explained that "[i]n my experience [Jehovah Witnesses] are reluctant to exercise authority over their fellow human beings in this Court House." 504 N.W.2d 767, 768 (Minn.1993), *cert. denied*, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994).

In his dissenting opinion to the Court's denial of certiorari, Justice Thomas—joined by Justice Scalia—wrote:

Indeed, given the Court's rationale in *J.E.B.*, no principled reason immediately appears for declining to apply *Batson* to any strike based on a classification that is accorded heightened scrutiny under the Equal Protection Clause. The Court's decision in *J.E.B.* was explicitly grounded on a conclusion that peremptory strikes based on sex cannot survive "heightened scrutiny" under the Clause ... because such strikes "are not substantially related to an important government objective," .... In breaking the barrier between classifications that

---

**9.** In *Bethley v. Louisiana*, 520 U.S. 1259, 1259, 117 S.Ct. 2425, 138 L.Ed.2d 188 (1997), the United States Supreme Court acknowledged that its decision to deny·a petition for writ of certiorari does not, in any sense, constitute a ruling on the merits of the case in which the writ was sought.

merit strict equal protection scrutiny and those that receive what we have termed "heightened" or "intermediate" scrutiny, *J.E.B.* would seem to have extended *Batson*'s equal protection analysis to all strikes based on the latter category of classifications—a category which presumably would include classifications based on religion. It is at least not obvious, given the reasoning in *J.E.B.*, why peremptory strikes based on religious affiliation would survive equal protection analysis.

*Davis*, 511 U.S. at 1117, 114 S.Ct. 2120. In response, Justice Ginsburg reminded her colleagues that religion, as opposed to race and gender, is not always self-evident and, further, that inquiry on voir dire into a juror's religious affiliation and beliefs is irrelevant, prejudicial, and improper. *Id.*

Although the United States Supreme Court has not squarely addressed the issue at hand, a number of state and federal courts have reviewed peremptory challenges based upon religion and religious activities. *See State v. Fuller*, 182 N.J. 174, 862 A.2d 1130, 1139–40 (2004) (citing *United States v. Brown*, 352 F.3d 654, 669 (2d Cir.2003) (holding that after *Batson* and *J.E.B.*, potential jurors cannot be excused solely because of religious affiliation, but, also, that "[d]ifferentiating among prospective jurors on the basis of their [religious] activities does not plainly implicate the same unconstitutional proxies"); *United States v. DeJesus*, 347 F.3d 500, 510 (3d Cir.2003) (holding "no need [to] reach the question of whether peremptory strike based solely on religious affiliation would be unconstitutional" because strikes at issue were properly based on religious activities), *cert. denied*, 541 U.S. 1086, 124 S.Ct. 2811, 159 L.Ed.2d 248 (2004); *United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir.1998) (suggesting but not deciding that peremptory challenges based upon religious affiliation "would be improper and

perhaps unconstitutional," whereas strikes based upon belief related to case and perhaps even based upon religious tenets would be permissible), *reh'g denied, suggestion for reh'g en banc denied, modified on other grounds*, 136 F.3d 1115 (1998); *State v. Hodge*, 248 Conn. 207, 726 A.2d 531, 553 (1999) ("[O]ne's religious affiliation, like one's race or gender, bears no relation to that person's ability to serve as a juror."), *cert. denied*, 528 U.S. 969, 120 S.Ct. 409, 145 L.Ed.2d 319 (1999); *Casarez v. State*, 913 S.W.2d 468, 495 (Tex.Crim. App.1995) (holding that challenges based upon religious affiliation are justified as "promot[ing] fairness and impartiality on the jury"); *and* Caroline R. Krivacka & Paul D. Krivacka, Annotation, *Use of Peremptory Challenges to Exclude Persons from Criminal Jury Based on Religious Affiliation—Post–Batson State Cases*, 63 A.L.R. 5th 375 (1998)).

A review of these cases reveals an emerging consensus to extend the equal protection analysis of *Batson* and *J.E.B.* to peremptory challenges based solely upon religious affiliation and to find those challenges unconstitutional. *Fuller*, 862 A.2d at 1140. Challenges based upon religious beliefs or religious activities, however, are generally permitted. *Id.* In respect of those former challenges, the courts reason that the origin of a belief, religious, political or social, is irrelevant to the question of whether the juror holding that belief will be able to carry out his or her duties in relation to the case at bar impartially and as instructed by the court. *Id.*

Like many other jurisdictions, we cannot discern, nor has the State brought to our attention, any "principled basis ... for confining the holding in *J.E.B.* to the context of sex." *Davis*, 511 U.S. at 1117, 114 S.Ct. 2120 (Thomas, J., dissenting). The judiciary has uniformly employed strict

scrutiny in evaluating the constitutionality of state interference with or involvement in religion.[10] Accordingly, to survive equal protection analysis, the use of a peremptory challenge to remove a prospective juror on the basis of his or her religious affiliation must constitute a narrowly tailored means to serve the compelling state interest of ensuring a fair and impartial jury. *See, e.g., Hodge*, 726 A.2d at 553. Although one's religious *beliefs* may render a prospective juror unsuitable for service in a particular case, one's religious *affiliation*, like one's race or gender, bears no relation to that person's ability to serve as a juror. *See McCollum*, 505 U.S. at 59, 112 S.Ct. 2348 (holding that "[i]n our heterogenous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion") (internal quotation marks omitted).

■ Moreover, to allow the exclusion of an otherwise qualified venire person simply on account of that person's religious affiliation would amount to permitting jury selection procedures that promote "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice;" a practice that the United States Supreme Court has expressly rejected as violative of the Equal Protection Clause. *See J.E.B.*, 511 U.S. at 128, 114 S.Ct. 1419.

Absent a showing that the holding of *J.E.B.* is not logically applicable to religion, we conclude that the equal protection clause of the Fourteenth Amendment to the Federal Constitution prohibits the exercise of a peremptory challenge to excuse a venire person because of his or her religious affiliation.

■ Having so concluded, however, we find that the primary motivation behind the State's use of a peremptory challenge against Juror 92 did not concern his religious affiliation. Here, in expressing a race-neutral justification for the strike of Juror 92, the prosecutor stated: "First of all Your Honor, in his profession he's a Pastor and I never take any Pastors, Ministers, Reverends, [or] Priests on my jury panels just because they're more apt for forgiveness." This statement, which bears upon Juror 92's religious affiliation, as opposed to a particular religious belief, is improper. That said, our review of the State's voir dire of Juror 92 indicates that the State's principal concern was Juror 92's lack of respect and confidence in the criminal justice system, and not his religious affiliation. Indeed, in the lengthy colloquy between the State and Juror 92, which was quoted above, the prosecutor never questioned the prospective juror about his religious affiliation.

Instead, the prosecutor's line of questioning pertained to Juror 92's question-

---

10. Because religion-based constitutional challenges generally are raised under the free exercise or establishment clauses of the first amendment to the United States constitution, "[r]eligious discrimination rarely is challenged under the [federal] equal protection clause." *See* Note, "Applying the Break: Religion and the Peremptory Challenge," 70 IND. L.J. 569, 591 (1995); *see also* Note, "Religion–Based Peremptory Challenges After *Batson v. Kentucky* and *J.E.B. v. Alabama:* An Equal Protection and First Amendment Analysis," 94 MICH. L. REV. 191, 204 (1995).

Government action that discriminates on the basis of religion under either the free exercise clause or the establishment clause is, however, subject to strict scrutiny. *See, e.g., State v. Hodge*, 248 Conn. 207, 726 A.2d 531, 553 n. 43 (1999) (citing *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)) (for purposes of free exercise challenge, law restrictive of religious practice must be "narrowly tailored" to advance "compelling governmental interest").

naire, wherein the prospective juror indicated that he: (1) lacked confidence in the criminal justice system; (2) believed such system operated differently for black versus white, and rich versus poor, individuals; and (3) did not wish to participate in the jury process. Juror 92's responses to the questionnaire led the prosecutor to believe that "the deck may be stacked against [him] at even convincing [the juror] that something happened." In light of these comments, we conclude that the State did not strike Juror 92 because of his religious affiliation. However, we remind the State that its practice of exercising peremptory challenges against leaders of religious organizations, without regard to any particular belief, is improper and an unconstitutional proxy for juror competence and impartiality.

### III. Admission of the 9–1–1 Tape

Lastly, Highler argues that the trial court abused its discretion by admitting the 9–1–1 audiotape because the prejudicial nature of the tape substantially outweighed its probative value, pursuant to Indiana Evidence Rule 403.[11] The admission or exclusion of evidence is a matter left to the sound discretion of the trial court, and we will reverse only upon an abuse of that discretion. *Johnson v. State*, 671 N.E.2d 1203, 1205 (Ind.Ct.App.1996), *trans. denied.* An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the circumstances before it. *Sparkman v. State*, 722 N.E.2d 1259, 1262 (Ind.Ct.App.2000).

In addressing whether the probative value of the evidence at issue, i.e., the 9–1–1

tape, was substantially outweighed by its prejudicial impact to Highler, we must examine the contents of the tape. In the 9–1–1 tape at issue, Merrill informs the emergency operator that S.B. had just been raped by a man named Marshall. Merrill—who is crying and sobbing—also repeatedly apologizes to S.B. for: (1) leaving her behind in the residence, thus, allowing the rape to occur; and (2) not alerting the police to Highler's plan before the rape had occurred. In addition, at one point during the audiotape, Merrill gives the telephone to S.B., who is also crying and sobbing. The only question of substance that the operator asks S.B. is: "where do you live," to which S.B. responds, "at home." State's Ex. 13.

The 9–1–1 tape in dispute is, without question, prejudicial to Highler. Indeed, at trial, before admitting the tape into evidence, the trial court admonished the jury not to consider it for the truth of the matter asserted. Instead, the trial court directed the jury to consider only that the statements were made. Prejudice alone, however, is not sufficient to render the evidence in question inadmissible. Rather, the danger of unfair prejudice must substantially outweigh the evidence's probative value. Indiana Evidence Rule 403.

Here, in light of the trial court's admonishment, coupled with the fact that Highler testified that S.B. consented to the sexual encounter and only later alleged rape, the probative value of the 9–1–1 tape—which demonstrated how emotional Merrill and S.B. were following the sexual encounter— was not substantially outweighed by the tape's prejudicial impact.[12] Thus, we find

---

**11.** Indiana Evidence Rule 403 provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or

needless presentation of cumulative evidence."

**12.** The tape was also highly relevant to rebut Highler's defense, at trial, that Merrill and S.B. fabricated the alleged rape because Mer-

no abuse of discretion in the admission of the 9–1–1 tape.[13]

For the foregoing reasons, we affirm Highler's conviction for rape as a Class B felony.

Affirmed.

FRIEDLANDER, J., concurs.

ROBB, J., concurs with separate opinion.

ROBB, Judge, concurring with separate opinion.

I concur in the majority's general discussion of exclusion of jurors based upon religious affiliation and its conclusion that Juror 92 was not improperly excluded from the jury. However, I write separately to note that I do not believe the State's justification for striking Juror 92—that "in his profession he's a Pastor and I never take any Pastors, Ministers, Reverends, [or] Priests on my jury panels"—is a statement improperly bearing upon Juror 92's religious affiliation. In this particular instance, I believe the State's justification bears only upon his occupation. Although this particular juror's occupation incidentally implies that he *has* a religious affiliation, the State did not single out any one religious affiliation, and I therefore do not believe the State made an improper statement.

In all other respects, I concur in the majority opinion.

rill was angry that Highler had sexual intercourse with Merrill's date and S.B. was experiencing remorse after the sexual encounter. Instead, the 9–1–1 tape revealed that, immediately following the incident—while Merrill and S.B. were still emotionally excited or upset—Merrill told the emergency operator that Highler had raped S.B.

13. Moreover, even assuming that the admission of the 9–1–1 tape was improper under Indiana Evidence Rule 403, we observe that the salient information contained in the tape was cumulative of S.B.'s and Merrill's testimonies. Indeed, S.B. testified that Highler had forced her to engage in sexual intercourse against her will. In addition, Merrill testified that, at the time of the incident in question, S.B. was extremely intoxicated to the point where he thought it would be illegal to have sexual relations with her. He further testified that Highler informed him of Highler's plan to have sex with S.B. and gave Merrill the option to either join in on the rape, leave the party, or fight. Because the evidence at issue was cumulative of other testimony properly admitted at trial, any error in its admission was harmless. *See, e.g., Hyppolite v. State,* 774 N.E.2d 584, 592 (Ind.Ct. App.2002) ("Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted."), *trans. denied.*